

**FILED**

IN THE UNITED STATES DISTRICT COURT **N** AUG 14 2008
FOR THE NORTHERN DISTRICT OF ILLINOIS     AUG 14 2008
EASTERN DIVISION

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| Abe Kaplan, M.D., | 08cv4609 |
| | JUDGE ZAGEL |
| Plaintiff, | MAG. JUDGE NOLAN |
| | |
| v. | ) Plaintiff Demands Trial by |
| | ) Jury |
| Michael L. Seigle, M.D., Evelyn S. Ackermann, | ) |
| M.D., & Ophthalmology Associates, Ltd., | ) |
| | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

Plaintiff, Abe Kaplan, M.D., by his attorney, James E. Betke, complains of defendants

Michael L. Seigle, M.D., Evelyn S. Ackermann, M.D. and Ophthalmology Associates, Ltd. and

states:

1. Plaintiff is a citizen and resident of Arizona.

2. Defendants Seigle and Ackermann are citizens and residents of Illinois.

3. Defendant Ophthalmology Associates, Ltd. is an Illinois corporation with its principal

place of business in Illinois.

4. This court has jurisdiction of this case pursuant to 28 U.S.C. §1332 because the

amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

5. Prior to January 1, 2005, defendants Seigle and Ackermann were shareholders of

Seigle-Ackermann Eye Associates, Ltd. ("the Corporation"). The Corporation subsequently

changed its name and is now known as Ophthalmology Associates, Ltd.

6. Effective January 1, 2005 plaintiff and defendants Seigle and Ackermann entered into a Stock Purchase Agreement, a copy of which is attached as Exhibit A.

7. By the terms of the Stock Purchase Agreement, plaintiff agreed to purchase, and defendants Seigle and Ackermann each agreed to sell, 1/3 of the shares owned by them, so that, following the purchase, plaintiff and each individual defendant would own 1/3 of the stock of the Corporation. The parties subsequently completed the purchase and sale, and plaintiff became the owner of 1/3 of the shares of the Corporation effective January 1, 2005.

8. Effective January 1, 2005, plaintiff and the defendants entered into a Shareholders Agreement, a copy of which is attached as Exhibit B. The Shareholders Agreement provided that if any of the three shareholders ceased to be employed by the Corporation, all of his or her shares were subject to an option to purchase by the remaining shareholders. If the remaining shareholders did not agree to purchase the stock of the departing shareholder, then the Corporation was required to do so.

9. The purchase price for the shares was to be calculated based on the Adjusted Book Value of the Corporation in accordance with Article 5 of the Shareholders Agreement. Adjusted Book Value was defined as the book value of the corporate assets, less the amount of its liabilities, as disclosed by the company's books of account regularly maintained in accordance with generally accepted accounting principles consistently applied, but subject to certain adjustments.

10. Insofar as relevant here, adjustments could be made for reasonable reserves for contingent liabilities and bad debts established in good faith and consistent with prior practices, but no adjustments were to be made on account of any event occurring subsequent to the Valuation Date, as defined in the Shareholders Agreement. In addition, the value of the assets

was to be reduced by the amounts of trade accounts payable, accrued employee wages and payroll taxes, together with any amounts due under bank notes or mortgages.

11. Pursuant to the Shareholders Agreement, the Valuation Date was defined as the end of the calendar month immediately preceding the date on which the withdrawing shareholder gave notice of his or her withdrawal.

12. On January 29, 2008, plaintiff gave notice to defendants that he was leaving his employment with defendant Ophthalmology Associates, Ltd. The Valuation Date for determining the price to be paid for plaintiff's stock was thus December 31, 2007. Plaintiff terminated his employment effective May 31, 2008.

13. Defendants Seigle and Ackermann subsequently advised plaintiff that they would exercise their option to purchase his stock, but have not consummated the purchase.

14. Despite the requirements of the Shareholders Agreement, defendants Seigle and Ackermann failed and refused to pay or tender to plaintiff the amount due him for his shares. Instead, those defendants contended that plaintiff's shares had a negative value, a contention based on the creation of various non-existent contingent liabilities. None of those contingent liabilities was permissible under the Shareholders Agreement.

15. Plaintiff is entitled to be paid in excess of $140,000 for his stock, pursuant to the valuation method set forth in the Shareholders Agreement. In breach of their obligations under that agreement, defendants Seigle and Ackermann have failed and refused to pay or agree to pay plaintiff the amount due him for his shares of stock. The defendant Ophthalmology Associates, Ltd. has also failed to purchase plaintiff's shares, in breach of its obligations under the Shareholders Agreement.

WHEREFORE plaintiff prays that judgment be entered in his favor against the
defendants for the sum of $140,959, plus interest and costs, together with such other and further
relief as this court deems just and proper.

August 13, 2008

James E. Betke

James E. Betke
James E. Betke, P.C.
161 N. Clark St., Suite 4950
Chicago, Il. 60601
jebetke@imsif.com
(312) 346-5050


## Jury Demand

Plaintiff demands trial by jury.

4

# STOCK PURCHASE AGREEMENT

This Agreement ("Agreement") is entered into as of January 1, 2005 by and between Michael L. Seigle, M.D. ("Dr. Seigle"), Evelyn S. Ackermann, M.D. ("Dr. Ackermann") (individually referred to as a "Seller" and collectively referred to as "Sellers") and Abe Kaplan, M.D. ("Buyer").

RECITALS

A.   Dr. Seigle and Dr. Ackermann each own 50% of the issued and outstanding shares of common stock of Seigle-Ackermann Eye Associates, Ltd., an Illinois corporation (the "Company").

B.   Each Seller wishes to sell to Buyer, and Buyer wishes to purchase from each of the Sellers, one-third of each Seller's shareholdings in the Company such that, after closing the sale and purchase contemplated hereby, Buyer will own one-third, and each of the Sellers will retain one-third of the issued and outstanding shares of common stock of the Company.

C.   Contemporaneously herewith, (i) Sellers and Buyer and the Company have entered into the Seigle-Ackermann Eye Associates, Ltd. Shareholders Agreement, (ii) the Company has adopted the Seigle-Ackermann Eye Associates, Ltd. Deferred Compensation Plan, and (iii) the Company has entered into an Employment Agreement with each of the Sellers and with Buyer.

NOW THEREFORE, in consideration of mutual covenants and agreements made by the parties to this Agreement, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.   Purchase and Sale of Stock

   1.1.   Dr. Seigle agrees to sell to Buyer, and the Buyer agrees to buy from Dr. Seigle, 166,166 shares of the common stock of the Company held by Dr. Seigle for the consideration of $26,667.00 payable by or on behalf of the Buyer to Dr. Seigle.

   1.2.   Dr. Ackermann agrees to sell to Buyer, and the Buyer agrees to buy from Dr. Ackermann 166,166 shares of the common stock of the Company held by Dr. Ackermann for the consideration of $26,667.00 payable by or on behalf of the Buyer to Dr. Ackermann.

   1.3.   Each Seller hereby represents and warrants to the Buyer that such Seller has full power, right and authority to enter into this Agreement and sell the common stock to be sold by such Seller hereunder, that such Seller has not previously sold, assigned, pledged or otherwise transferred such shares or any interest therein, and that such shares are free and clear of any liens, pledges, encumbrances, options, warrants, equitable interests, agreements, rights or claims. The Sellers hereby jointly represent and warrant to Buyer



EXHIBIT

B

that the shares sold by them to Buyer hereunder in the aggregate represent one third of all outstanding shares capital stock of the Company on a fully-diluted basis.

1.4.  The closing of the sale of purchase transactions shall occur contemporaneously with the execution of this Agreement. At the closing, the parties hereto shall do the following:

a.  The Buyer shall pay the sum of $26,667.00 to Dr. Seigle and $26,667.00 to Dr. Ackermann; provided that of such amounts a total of $ O        shall be paid on Buyer's behalf by the Company in satisfaction of certain amounts owed to Buyer by the Company.

b.  Each of Dr. Seigle and Dr. Ackermann shall deliver to the Buyer duly executed stock powers for the transfer of the shares to be sold by them to Buyer hereunder, together with stock certificates.

c.  Each of the Sellers and Buyer shall enter into and deliver copies to each other and to the Company of the Seigle-Ackermann Eye Associates, Ltd. Shareholders Agreement.

d.  Each of the Sellers and Buyer shall enter into their respective Employment Agreements with the Company and deliver same to the Company.

e.  The board of directors of the Company shall have duly adopted the Seigle-Ackermann Eye Associates, Ltd. Deferred Compensation Plan (the "Plan"), and the Company shall have executed and delivered to Buyer and to each Seller such person's respective Deferred Compensation Agreement under the Plan.

f.  The Company shall issue a certificate to the Buyer representing one-third of the then issued and outstanding total shares of common stock of the Company.

g.  The Company shall issue replacement certificates to each of Dr. Seigle and Dr. Ackermann reflecting the remainder of their shares of common stock of the Company, each consisting of one-third of the issued and outstanding stock of the Company.

h.  The by-laws of the Company shall have been restated in the form attached as Exhibit A attached hereto and each of the Sellers and the Buyer shall have been elected to the Board of Directors of the Company.

2.  Sellers shall be responsible for the payment of any and all income taxes upon the sale of shares of stock to Buyer.

3.    The officers of the Company shall be authorized and directed, and each party hereto hereby agrees, to take such other action that is necessary or appropriate to implement the terms of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

SELLERS                                          BUYER

_____                    _____
Michael L. Seigle, M.D.                          Abe Kaplan, M.D.

_____
Evelyn S. Ackermann, M.D.

3

## SEIGLE-ACKERMANN EYE ASSOCIATES, LTD.
## SHAREHOLDERS AGREEMENT

THIS SHAREHOLDERS AGREEMENT (the "Agreement") is entered into as of the 1st day of January, 2005, by and among MICHAEL L. SEIGLE, M.D. ("Dr. Seigle"), EVELYN S. ACKERMANN, M.D. ("Dr. Ackermann"), ABE KAPLAN, M.D. ("Dr. Kaplan") (collectively, the "Shareholders") and Seigle-Ackermann Eye Associates, Ltd., an Illinois corporation (the "Company").

### RECITALS

A.    Dr. Seigle, Dr. Ackermann and Dr. Kaplan each own one-third of the outstanding shares of common stock of the Company.

B.    The Shareholders and the Company desire that the capital stock of the Company owned by any of the Shareholders not be placed upon the open market for sale and transfer in order to maintain continuity in the management and policies of the Company and to prevent strangers from becoming shareholders in the Company.

C.    The Shareholders and the Company desire to impose restrictions on all of the presently outstanding shares of common stock of the Company and all shares of stock of the Company to be issued in the future (collectively, the "Shares").

D.    The Company and the Shareholders believe that it is in the best interests of the Company and of the Shareholders to make provision for future disposition of the Shareholders' Shares, now owned or hereafter acquired.

E.    The Shareholders believe it to be in their best interests and in the best interest of the Company that the Shares of shareholders who leave the practice be acquired by the remaining Shareholders or the Company.



F.    The Company has entered into Employment Agreements with each of the Shareholders.

## AGREEMENT

NOW THEREFORE, in consideration of the mutual covenants and agreements made by the parties to this Agreement, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.    **Definitions.**

1.1    The term "Legal Representative" of a Shareholder means without limitation, the executor or administrator of a deceased Shareholder's estate, the conservator or other legal representative of a disabled or incompetent Shareholder's estate, or the then serving trustee of any trust established by such deceased Shareholder as in effect at such Shareholder's death.

1.2    The term "Transfer" means any transfer, assignment, conveyance, gift, hypothecation, pledge or any form of alienation, or in any manner dispose of or permit a levy or attachment on, all or any part of any of the Shares, or any right or interest therein, whether voluntarily or by operation of law including, without limitation, to a Shareholder's trustee in bankruptcy, to a purchaser at a creditor's or court sale, to a creditor in pursuance of a debt or judgment, to a guardian of an incompetent, to a former spouse pursuant to a decree for divorce or dissolution of marriage.

2.    **Restriction Against Transfer.**

Each Shareholder agrees not to Transfer any of his or her Shares which he or she may now or hereafter own or control, unless such Transfer complies with the terms of this Agreement. Any purported Transfer of Shares in violation of any provision of this Agreement shall be void, shall not be recognized by the Company and shall give the Company and the other Shareholders an option to purchase such Shares pursuant to the provisions of Article 3 hereof.

**3.**    <u>Option Upon Departure of Shareholder.</u>

3.1    <u>Triggering Events and Target Shares.</u>  Upon any Shareholder's ceasing to be employed by the Company for any reason other than his or her death or a Permanent Disability (as defined in Section 4.2) (including, without limitation, being terminated by the Company with or without cause) (a "Triggering Event"), all the Shares of such Shareholder (the "Target Shares") shall be subject to the option to purchase and Company Repurchase Obligation set forth below.  Any a Shareholder who desires to voluntarily withdraw from the operations of the Company (the "Withdrawing Shareholder" herein) shall give at least 120 days prior notice of such intent ("Withdrawal Notice") to the remaining Shareholders (the "Continuing Shareholders").

3.2    <u>Option of Continuing Shareholders.</u>  Upon their receipt of a Withdrawal Notice or the existence of some other Triggering Event, the Continuing Shareholders shall have the option to purchase (and if exercised then the Withdrawing Shareholder shall be required to sell) any or all of the Target Shares (the "Shareholder Option").  The Shareholder Option shall be exercisable by the Continuing Shareholders at any time during a period of thirty (30) days commencing with the date of such Withdrawal Notice or a Triggering Event.  They may exercise the Shareholder Option and thereby purchase a number of the Target Shares which is in proportion to the number of Shares each Continuing Shareholder then holds or such other allocation among them as they may mutually agree.  Each of such Continuing Shareholders shall give notice to the owner or owners of the Target Shares and each other, specifying whether the Continuing Shareholder(s) desire to purchase the allocable number of such Target Shares within the aforesaid thirty (30) day period.

3.3    <u>Company Repurchase Obligation.</u>  If one or more of the Continuing Shareholders do not desire to purchase the allocable portion of the Target Shares pursuant to Section 3.2 (or if

3

the Continuing Shareholders do not otherwise agree to purchase in the aggregate all of the Target Shares), the Company shall be required (the "Company Repurchase Obligation") to purchase (and the holder(s) of the Target Share shall be obligated to sell) all of the Target Shares. The Company Repurchase Obligation shall apply unless each of the Continuing Shareholders exercise the Shareholder Option.

3.4    Terms of Purchases. All purchases to be made pursuant to this Section 3 shall be at the price specified in Article 5 and on the terms specified in Article 6.

3.5    Release or Indemnification of Withdrawing Shareholder. If the Target Shares are purchased by the Continuing Shareholders or the Company, the Continuing Shareholders shall use his or her good faith best efforts to:

a.    obtain a release of the obligations of the Withdrawing Shareholder's personal guarantees of the Company's indebtedness; or if not obtainable

b.    indemnify, defend and hold the Withdrawing Shareholder, or his or her personal representative or legal guardian, as the case may be, harmless from and against any loss, damage, liability, and expense of whatever kind or nature which Withdrawing Shareholder may suffer, sustain, or incur as a result of the Company's indebtedness incurred subsequent to the effective date of the sale of the Target Shares.

4.    Purchase Upon Death or Disability of Shareholder.

4.1    Death. Upon the death or Permanent Disability (as defined below) of a Shareholder, the provisions of Sections 3.2, 3.3 and 3.5 shall apply. Unless the Continuing Shareholders unanimously decide to exercise the Shareholder Option, the Company shall have the obligation to purchase all the Shares owned by the deceased or disabled Shareholder ("Departed Shareholder") and the owners of the Departed Shareholder's Shares shall be obligated to sell all such Departed Shareholder's Shares to the Company; provided that the

4

Departed Shareholder has been continuously employed by the Company from the date of this Agreement until the date of his death or Permanent Disability.

For purposes hereof, a Shareholder will be deemed to be "Disabled" for the purposes of this Agreement if he or she is either (a) unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or can be expected to last for a continuous period of not less than 12 months, or (b) by reason of any medically determinable physical or mental impairment which can be expected to result in death or can be expected to last for a continuous period of not less than 12 months, receiving income replacement benefits for a period of not less than 3 months under an accident and health plan covering the Company's employees, each as determined by the Company of if disputed by Shareholder, by an independent physician mutually selected by Shareholder (or his or her legal representative) and the Company. The cost of examination of the subject Shareholder by such physician shall be paid by the Company.

4.2    Terms of Purchase.  Purchase under this Article 4 shall be at the price specified in Article 5 and on the terms specified in Article 6.

5.    **Determination of Purchase Price for Purposes of Articles 3 and 4.**

5.1    Valuation of Shares.  For purposes of Articles 3 and 4 hereof, the purchase price for the purchased Shares shall be calculated based on the Adjusted Book Value of the Company, as defined below, divided by the number of Shares then outstanding.

5.2    Adjusted Book Value.  The Adjusted Book Value of the Company ("Adjusted Book Value"), shall be determined by the Company's Certified Public Accountants equal to the book value of the Company's assets, less the amount of its liabilities, on the Valuation Date, as disclosed by the Company's books of account regularly maintained in accordance with generally accepted accounting principles consistently applied, but adjusted as follows:

a.    Any insurance owned by the Company on the life of a Shareholder shall not be included as an asset in the value of the Company.

b.    No adjustment shall be made on account of any event occurring subsequent to the Valuation Date, whether the event constitutes an adjustment to the Federal or State income tax liability of the Company or otherwise except as otherwise provided in this Agreement.

c.    Reasonable reserves for contingent liabilities and bad debts established in good faith and consistent with prior practices shall be treated as liabilities.

d.    The value of assets of the Company shall be determined as follows:

| Asset | Method of Valuation |
|---|---|
| Equipment | Each component of equipment shall be assigned the depreciable life listed below, with a minimum value of 10% of original cost: |
| Office Equipment | 15 Years |
| ~~Dental Equipment~~ Medical Equipment | ~~10 Years~~ 10 yrs |
| Leasehold Improvements | 15 Years |
| Computers | 5 Years |
| Supplies | A physical inventory to be taken and valued using current catalog prices. |
| Monetary Assets | Checking and savings accounts and other receivables, less any amounts reserved as uncollectible, established in good faith and consistent with prior practices. |

e.    The value of assets shall be reduced by the amounts of trade accounts payable, accrued employee wages and payroll taxes and principal, interest and any other amounts due under bank notes and mortgages.

f.    No value will be included for goodwill.

5.3    <u>Valuation Date</u>.  The valuation date of the Adjusted Book Value of the Company ("Valuation Date") shall be as of the end of the calendar month immediately preceding:

6

a.    date of Withdrawal Notice by Withdrawing Shareholder to remaining Shareholders, if applicable, or the date of any other Triggering Event; or

b.    date of the death or the effective date of a Shareholder becoming Disabled, if applicable.

The value of each of the Shares to be purchased shall be equal to the quotient of the Adjusted Book Value of the Company and the total number of issued and outstanding shares of the Company as of the Valuation Date.

**6.    Payment of Purchase Price.**

6.1    Closing.  The purchase of Shares pursuant to rights or obligations provided under this Agreement shall be referred to hereinafter as a "Closing."  A Closing upon the purchase of Shares pursuant to the provisions of Articles 3 or 4 hereof, shall take place no later than ninety (90) days after the cessation of employment or other Triggering Event, of a Withdrawing Shareholder, death or determination of Disability, as the case may be.  Closing shall take place at the principal office of the Company at 10:00 a.m. unless the purchaser(s) and seller(s) shall agree otherwise.

6.2    Payment Terms.  Payments for the purchase of Shares pursuant to Article 4 shall be paid at Closing by certified or cashier's check for the entire purchase price.

6.3    Deliveries at Closing.  Certificate(s) for Shares which are purchased shall be delivered at the Closing duly endorsed in blank or accompanied by a duly endorsed instrument of transfer sufficient to transfer such Shares to the purchaser.  A purchaser shall also be entitled to receive at the Closing from the seller a written representation and warranty that the purchaser will have, upon receipt of the Shares sold, good and marketable title to such Shares, free and clear of all liens, security interests and encumbrances other than the encumbrance of this Agreement.  The seller shall receive payment of the purchase price in full at Closing.

7

7.    **Life Insurance.**

7.1    The Company may, but shall not be obligated to, acquire policies of life insurance on such Shareholders and in such amounts as is separately determined by the Company. The proceeds of any such policies payable to the Company shall be used to satisfy its obligations under this Agreement in the event of the death of an insured Shareholder.

7.2    The Company may be the owner or beneficiary of policies of life insurance on one or more of the Shareholders. If requested by the Company, each Shareholder agrees to complete all application(s) and submit to such physical examination(s) as may be required to obtain such policy(ies) of insurance.

8.    **Notices.**

All notices required to be given hereunder shall be deemed to be duly received, (i) if hand delivered, on the date personally delivered, (ii) if sent by nationally recognized overnight delivery service, delivery prepaid, on the next business day after the business day on which tendered to the delivery service, or, (iii) if mailed, on the third business day after the date of mailing, postage prepaid, via certified or registered mail, in each case to the following addresses:

To the Company:                    Seigle-Ackermann Eye Associates, Ltd.
                                   87 North AirLite Street, Suite G12
                                   Elgin, IL  60123-4990

To Dr. Seigle                      Michael L. Seigle, M.D.

                                   _____
                                   _____


To Dr. Ackermann:                  Evelyn S. Ackermann, M.D.
                                   23384 N. Longview Point
                                   Lake Barrington Il 60010

To Dr. Kaplan:                     Abe Kaplan, M.D.

                                   _____
                                   _____

8

Document ID: 403807.5  12/14/2005 4:07:41 PM

The addresses provided in this Article shall be changed solely by a Shareholder giving written notice of such change of address to the other parties hereto as provided above.

9.      **Restriction on Certificates.**

The Company and each Shareholder agree that the certificates representing the Shares shall have endorsed upon the front side the words "See legend on reverse side" and have endorsed on the reverse side the following legend:

"The shares represented by this certificate are subject to certain restrictions upon transfer under the terms of an Agreement entered into by Seigle-Ackermann Eye Associates, Ltd. and its shareholders, dated as of January 1, 2005, a copy of which is on file, and may be examined at the principal office of this corporation."

Under no circumstances shall any sale or other transfer of all or any portion of the Shares subject hereto be valid unless such sale or transfer shall satisfy the requirements of this Agreement.

10.     **No Guarantee of Employment.**

Each Shareholder hereby acknowledges and agrees that he has been given no guarantee of employment and that notwithstanding his ownership of Shares except as provided for under his or her Employment Agreement, such Shareholder remains an employee at will.

11.     **Term of Agreement.**

This Agreement shall remain in full force and effect until the first to occur of the following:

a.      The action or consent of all Shareholders then holding Shares; or

b.      The voluntary or involuntary dissolution of the Company; or

9

c.      The entering of an order for relief in a federal bankruptcy proceeding involving the Company's property as comprising a bankrupt's estate, the execution by the Company of any assignment for the benefit of creditors, or the appointment of a receiver of the Company; provided, however, that any rights, obligations and claims arising from this Agreement shall be perfected, and not foreclosed as of said termination date, if such rights, obligations or claims shall have arisen prior to the termination of this Agreement, and the time specified herein for the expiration of such right, obligation or claim shall not have been reached.

## 12.    Restrictions During Pendency of Purchase

During (i) the pendency of an option to purchase Shares of stock pursuant to Article 3 or 4, or (ii) the period between the acceptance of such offer or the exercise of such option and the closing date, the Company shall not:

a.      declare or pay any dividends on its capital stock; or

b.      increase or change the outstanding shares of its capital stock; or

c.      reorganize its capital structure; or

d.      issue any additional shares of stock or incur any additional material indebtedness; or

e.      merge or consolidate with any other corporation; or

f.      sell any substantial or material portion of its assets, except in the regular course of its business.

During any of these periods, each Shareholder shall have the right to examine the books and records of the Company, from time to time, and to receive copies of all accounting reports and tax returns prepared for or on behalf of the Company. If the Company breaches any of its undertakings under this Article and fails to cure such breach within fifteen (15) days after notice thereof is given to the Company by any Shareholder, then such Shareholder (in addition to any

other remedies available) at his or her option, may declare such offer rejected, such acceptance revoked or such option declined, as the case may be.

**13.    Agreement by Company.**

The Company consents to this Agreement and agrees that:

13.1    Transfer of Shares by Company.  It will not transfer any Shares of its stock in violation of this Agreement without requiring proof of compliance with this Agreement.

13.2    Proper Endorsement.  All share certificates issued by the Company during the life of this Agreement to the Shareholders will be endorsed as provided in Article 7.

**14.    Restrictions on Voting**

Without the consent of all Shareholders, the Company shall not:   (a) agree to an unreasonable increase in the compensation of any Shareholder, (b) issue any additional shares of capital stock, (c) incur or make material extensions or modifications to any material indebtedness or long term lease obligations, (d) declare or pay dividends on its capital stock, (e) redeem or purchase any shares of stock of the Company other than pursuant to the terms of this Agreement, (f) merge or sell substantially all of its assets or goodwill outside of the ordinary course of business, (g) dissolve or liquidate, (h) enter into or modify any material agreement with any shareholder or person or entity with whom a shareholder is affiliated (other than employment agreements in the ordinary course of business), or (i) discontinue or reduce its professional liability or other material business insurance.

**15.    Specific Performance**

The parties hereto acknowledge that the Shares are unique assets and that it will be impossible to measure, in money, the damages which will accrue to a party hereto or the personal representative of a deceased Shareholder by reason of a failure to perform the substantive obligations under this Agreement.  The parties also desire that this Agreement be specifically

11

enforceable or enjoinable (as the case may be) in accordance with its terms without need of a bond. Therefore, if any party hereto or the personal representative or a deceased or incompetent Shareholder shall institute any action or proceeding to enforce the provisions hereof, any person (including the Company) against whom such action or proceeding is brought hereby waives the claim or defense therein that such party has an adequate remedy at law, and such person shall not urge in any such action or proceedings, the claim or defense that such remedy at law exists or that a bond is necessary. Accordingly, an action for specific performance may be instituted if such aggrieved party deemed such remedy appropriate. This is not to be construed as the sole or exclusive remedy for an aggrieved party hereunder, and the exercise or nonexercise of one or more remedies shall not be construed as a waiver of any other remedy or remedies.

16. **Binding Effect**

This Agreement shall be binding upon the Company, its Shareholders and their respective heirs, legal representatives, personal representatives, executors, administrators, successors and assigns. Any rights given or duties imposed upon the estate of a Shareholder shall inure to the benefit of and be binding upon the fiduciary of such decedent's estate in his fiduciary capacity. All persons bound by this Agreement shall take any and all actions necessary or appropriate for effectuating the purposes and provisions thereof, including but not limited to, the execution of wills containing provisions instructing their personal representatives to faithfully observe the provisions of this Agreement.

The purchaser or other transferee of any Shares shall be bound to the terms and provisions of this Agreement as if such person were an original signatory hereto, and such purchaser or transferee must sign a copy of this Agreement and agree to be bound by its provisions as a condition of closing. A copy of this Agreement shall be delivered to any such

12

person who may become a purchaser or transferee, by the Company as soon as practicable after the Company learns the identity and address of such person.

**17.  Miscellaneous.**

17.1  Construction.  Whenever used herein, the singular number shall include the plural, and the plural number shall include the singular, and the masculine, feminine and neuter expressions shall be interchangeable.  The paragraph titles used herein are for informational purposes only and shall not affect the meaning of the paragraphs of their terms.

17.2  Governing Law.  This Agreement has been executed in and shall be governed by the laws of the State of Illinois (without regard to its choice of law rules).

17.3  Inurement.  Subject to the restrictions against transfer or assignment as herein contained, the provisions of this Agreement shall inure to the benefit of and shall be binding on the assigns, successors in interest, legal representatives, estates, heirs, and legatees of each of the parties hereto, specifically including any Shareholder to whom Shares may be transferred in the future, which Shareholder must agree in writing to the terms hereof.

17.4  Amendment.  This Agreement shall be amended solely by the written consent of all of the parties to this Agreement at the time of such amendment.

17.5  Severability.  In the event that any of the provisions or any portions of this Agreement are held to be unenforceable or invalid by any court of competent jurisdiction, the validity and enforceability of the remaining provisions, or portions thereof, shall not be affected thereby.

17.6  Entire Agreement.  This Agreement contains the entire understanding between the parties hereto concerning the subject matter contained herein, and supersedes any other prior agreements relating to the subject matter herein, whether oral or written.  There are no representations, agreements, arrangements or understandings, oral or written, between and

13

among the parties hereto, relating to the subject matter of this Agreement, which are not fully expressed herein.

17.7    Inspection.  The books and records of the Company shall be open to inspection by any Shareholder and his or her professional advisors during normal business hours.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

COMPANY:

ATTEST:

SEIGLE-ACKERMANN EYE ASSOCIATES, LTD.

By: _____          By: _____
         Secretary                                            President

SHAREHOLDERS:

_____
Michael L. Seigle, M.D.

_____
Evelyn S. Ackermann, M.D.

_____
Abe Kaplan, M.D.

14